PIASKOSKI & ASSOCIATES, Plaintiff-Respondent-Cross-Appellant,

v.

Carl L. RICCIARDI, Defendant-Appellant-Cross-Respondent.†

Court of Appeals

*No. 03–0009. Submitted on briefs December 5, 2003.—Decided July 1, 2004.*

2004 WI App 152

(Also reported in 686 N.W.2d 675.)

† Petition to review denied 9-16-04.

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Russell T. Golla* of *Anderson, O'Brien, Bertz, Skrenes & Golla*, Stevens Point.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the brief of *Michael J. Ganzer* and *Joseph T. Ganzer* of *Hodan, Doster & Ganzer, S.C.*, Milwaukee.

· Before Deininger, P.J., Lundsten and Higginbotham, JJ.

¶ 1. DEININGER, P.J. Carl Ricciardi appeals a judgment entered after the trial court granted summary judgment to his former law firm, Piaskoski & Associates. The trial court concluded that Ricciardi and the firm had entered into a valid contract to equally divide attorney fees received in certain cases Ricciardi took with him when he left employment with the Piaskoski firm. Ricciardi claims the trial court erred in determining that an enforceable contract existed and in failing to declare the contract void on public policy grounds because it violated SCR 20:1.5(e) (2001–02).[1] The law firm cross-appeals, citing as error the trial court's denial of its request for leave to amend its complaint and the court's refusal to award the firm attorney fees it incurred in pursuing this litigation. We affirm on both the appeal and cross-appeal.

## BACKGROUND

¶ 2. The Piaskoski firm hired Ricciardi as an associate and encouraged him to concentrate on building the firm's personal injury practice. From February 1995 until May 1996, Ricciardi handled a number of personal injury cases for the Piaskoski firm as its

---

[1] All references to the Wisconsin Supreme Court Rules and the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

employee. Ricciardi voluntarily terminated his employment with the firm on or about May 7, 1996.

¶ 3. A number of Ricciardi's personal injury clients elected to continue representation with him after he left the firm and, consequently, Paul Piaskoski and Ricciardi entered into discussions on how to divide any contingency fees received by Ricciardi on these cases. On May 23rd, Ricciardi sent Piaskoski a letter identifying eighteen clients who had chosen to remain with Ricciardi upon his leaving the firm, and who had signed contingency fee agreements. On May 28th, Paul Piaskoski and Ricciardi met in person to discuss the fees of clients who were departing the firm with Ricciardi. Three days later, on May 31st, Ricciardi followed up with a letter in which he stated: "This letter will serve to confirm our agreement reached at our meeting . . . . Essentially, we agreed as follows: With respect to all future fees on the personal injury files identified in my letter of 5/23/96 with the exception of [named client], will be divided on a 50/50 basis plus any outstanding fees or disbursements."

¶ 4. The Piaskoski firm did not respond to the May 31st letter, but the parties thereafter equally divided the fees obtained in resolving the cases of at least nine of the eighteen clients identified in Ricciardi's May 23rd letter. One of the remaining cases, that of Daniel Knack, settled for some $780,000, generating a contingency fee of $227,542.29. The firm demanded one-half of the Knack fee inasmuch as Knack was among the clients identified in the May 23rd letter whose contingency fees were to be divided equally between the parties. Ricciardi refused to pay, however, asserting that there was no binding agreement between himself and the firm with regard to a fee division in the Knack case, or any other case. Ricciardi maintained

that his practice of sharing fees with the Piaskoski firm had been entirely voluntary and done out of respect for the fact that his and Piaskoski's families had a long-standing friendship. Ricciardi also contended that the fees in the other cases had been apportioned to reflect the amount of time Ricciardi had worked on them while still in the Piaskoski firm's employ. In Ricciardi's view, because he spent very little time advancing the Knack case while working for the firm, it was not entitled to any of the Knack fee.

¶ 5. The law firm sued Ricciardi for one-half of the Knack fee. The trial court granted summary judgment to the plaintiff law firm, concluding that the parties had entered into a binding agreement to equally split any contingency fee obtained in certain cases, including Knack's. The trial court ordered that the Piaskoski firm receive one-half of the fee generated in the Knack case and it entered judgment against Ricciardi for prejudgment interest and statutory costs. Ricciardi appeals the judgment against him claiming as error the trial court's grant of summary judgment to the firm for one-half of the Knack fee. The trial court also concluded that the "American Rule" prohibits an award of actual attorney fees to a prevailing party absent express statutory or contractual authorization, or a finding of frivolousness, and it thus denied the firm's request for its actual attorney fees in bringing this action. Finally, the trial court denied the firm's request to amend its complaint to add additional cases for which it claimed entitlement to one-half of any fees obtained by Ricciardi. The Piaskoski firm cross-appeals the denial of its requests for actual attorney fees and for leave to amend its complaint.

657

## ANALYSIS

¶ 6. We review an order for summary judgment de novo, applying the same standards as the trial court. *See Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625 (1991). Summary judgment is proper when the pleadings, answers, admissions and affidavits show no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Maynard v. Port Publ'ns, Inc.*, 98 Wis. 2d 555, 558, 297 N.W.2d 500 (1980). We will reverse a decision granting summary judgment if the trial court incorrectly decided legal issues or if material facts are in dispute. *See Coopman v. State Farm Fire & Cas. Co.*, 179 Wis. 2d 548, 555, 508 N.W.2d 610 (Ct. App. 1993). Even if certain facts are in dispute, the dispute will not prevent the granting of summary judgment if the facts at issue are "not material to the legal issue on which summary judgment is sought." *Tackes v. Milwaukee Carpenters Health Fund*, 164 Wis. 2d 707, 711, 476 N.W.2d 311 (Ct. App. 1991).

I.

¶ 7. A valid contract requires an offer, acceptance and consideration. *Briggs v. Miller*, 176 Wis. 321, 325, 186 N.W.2d 163 (1922). Offer and acceptance exist when the parties mutually express assent, and consideration exists if the parties manifest an intent to be bound to the contract. *Gustafson v. Physicians Ins. Co.*, 223 Wis. 2d 164, 173, 588 N.W.2d 363 (Ct. App. 1998). Whether the parties assented and exchanged consideration are factual questions, not legal questions. *See NBZ, Inc. v. Pilarski*, 185 Wis. 2d 827, 838, 520 N.W.2d 93 (Ct. App. 1994); *Hoeft v. U.S. Fire Ins. Co.*, 153 Wis. 2d 135, 144,

450 N.W.2d 459 (Ct. App. 1989). Generally, therefore, we will uphold a trial court's findings on these matters unless its findings are "clearly erroneous." WIS. STAT. § 805.17(2). Where the material facts are undisputed, however, as they must be for summary judgment to be properly granted, the existence and interpretation of a contract becomes a question of law which we decide de novo. *Gustafson*, 223 Wis. 2d at 172–73.

¶ 8. The trial court concluded that Ricciardi made an offer in his letter of May 23rd to resolve the issue of contingency fees received in cases where Ricciardi succeeded to the representation of former clients of the firm, as identified in the letter, Mr. Knack among them. The court decided that Ricciardi's offer was accepted by the firm in a meeting between Ricciardi and Paul Piaskoski held on May 28th, as evidenced by Ricciardi's May 31st letter confirming "our agreement reached at our meeting on 5/28/96" to divide "on a 50/50 basis," with one exception not relevant here, "all future fees on the personal injury files identified in my letter of 5/23/96." The trial court further concluded that the consideration for the parties' "clear and unambiguous" agreement was also "apparent from the May 31 document," in that "[b]oth sides compromised their respective claims for more than 50 percent of the fees in this fee dispute."

¶ 9. Ricciardi asserts, however, that the May 31st letter constituted his offer, and that the firm's failure to respond to that letter creates a material factual dispute as to whether there was a mutual assent to the terms of the letter. Ricciardi relies on *Phillips Petroleum Co. v. Taggart*, 271 Wis. 261, 73 N.W.2d 482 (1955), to support his argument that this letter was no more than an unaccepted offer, and that the firm cannot withhold

communication of its acceptance of the written offer and later treat it as a contract. Although the supreme court cited this general rule in *Phillips*, the court's ultimate conclusion was that, despite the fact that an acceptance was never communicated to the offering party, the offering party was still bound to its offer where both parties engaged in subsequent conduct evidencing knowledge and acceptance of the terms of the contract. *Id*. at 273–75. Thus, the holding in *Phillips* actually supports the firm's position, given that, in the years following the May 31st letter, Ricciardi sent the Piaskoski firm one-half of the fees in the cases of at least nine of the eighteen clients listed in the May 23rd letter, which the firm accepted without demanding a larger portion of the fees in those cases.

¶ 10. In any event, we conclude that the record supports the firm's assertion, and the trial court's conclusion, that there is no dispute that a binding agreement was reached at the meeting between Ricciardi and Paul Piaskoski on May 28th, and that Ricciardi's letter three days later simply memorialized the agreement that was reached. We agree with the trial court that that is exactly what Ricciardi plainly and unambiguously said in his May 31st letter, and the lack of ambiguity in the language chosen precludes a belated attempt to recharacterize what had occurred.

¶ 11. Moreover, we note that Paul Piaskoski averred in an affidavit supporting the firm's motion for summary judgment that he and Ricciardi "reached a verbal agreement on 5/28/96 for the division of fees on the list of outstanding cases appearing [in the May 23rd letter]. In the ensuing give-and-take negotiations, [Ricciardi] and I agreed that all fees were to be split on a 50/50 basis including the [Knack] case." In his opposing affidavit, Ricciardi states that he "did not enter into any

*written* agreement with the Piaskoski firm regarding the distribution of fees"; that "[f]rom the time I told Mr. Piaskoski what I would do regarding the division of fees, I never entered into any oral agreement *on an annual or other basis* pertaining to fee division"; and that "[t]here were no fee discussions with the Piaskoski firm until after I had terminated my employment in May of 1996." (Emphasis added.) These averments do not directly dispute that a verbal agreement was reached on May 28th that called for a fifty-fifty division of fees but did not require an annual or other periodic accounting of fees received.

¶ 12. Ricciardi next argues that, even if we conclude there is no basis in the record for him to dispute that the parties formed a valid, oral contract at the May 28th meeting, its terms were rendered ambiguous by the letters of May 23rd and 31st. Whether a contract is ambiguous presents a question of law, which we decide independently of the trial court. *Wausau Underwriters Ins. Co. v. Dane County*, 142 Wis. 2d 315, 322, 417 N.W.2d 914 (Ct. App. 1987). A contract is ambiguous if its terms are susceptible to more than one reasonable interpretation. *Wilke v. First Fed. Sav. & Loan Ass'n*, 108 Wis. 2d 650, 654, 323 N.W.2d 179 (Ct. App. 1982). When the terms of a contract are unambiguous, we will construe the contract as it stands without examining extrinsic evidence to determine the intent of the parties. *Rosplock v. Rosplock*, 217 Wis. 2d 22, 31, 577 N.W.2d 32 (Ct. App. 1998).

¶ 13. In his May 23rd letter, Ricciardi wrote this:

> Enclosed please find executed documentation from clients requesting that I continue to handle their pending legal matters. These individuals have signed contingency fee agreements. They are as follows:

[List of names, including Knack, labeled "a." through "r."]

The files that I was working on with Wendy were hers. Since I am no longer with the firm those clients will remain with Wendy. If *these cases* are successfully resolved, I have no problem with apportioning the fees in a reasonable manner to compensate you for the time I spent on these files. That is subject that you and I can address.

With respect to the contingent fee cases, I suggest that we do it as we did before—that we split the fees 50/50 plus costs and disbursements.

(Emphasis added.)

¶ 14. Ricciardi argues that the phrase "these cases" is ambiguous because it might refer either to the list of contingent fee cases identified in the paragraph preceding it, or to the cases that "Wendy" is working on. He suggests that further ambiguity is created when read in conjunction with the May 31st letter, which refers to different fee division arrangements for certain clients, and includes an assertion that, in at least one case, Ricciardi was "not inclined" to share his expected fee with the Piaskoski firm but "would be willing to happily reimburse you for the time spent on the file while I was in your office."

¶ 15. We conclude that the language of the May 23rd letter is not ambiguous and is not made so by the May 31st letter. The clients listed following the first paragraph of Ricciardi's May 23rd letter are identified as "individuals [who] have signed *contingency fee agreements*." (Emphasis added.) The sentence later in the letter in which Ricciardi proposes to "split the fees 50/50" begins with the phrase "[w]ith respect to the *contingent fee cases*" (emphasis added), a clear reference to the previously listed clients. The intervening para-

graph dealing with "Wendy's" cases can be read in no other way than as serving to distinguish between the clients identified in the list and "those clients [that] will remain with Wendy." The reference in the next sentence to "these cases," which Ricciardi asserts creates ambiguity, does not. "[T]hese cases" unambiguously refers to the clients that "will remain with Wendy," a different group of clients for whom Ricciardi proposes a different resolution of fee issues.

¶ 16. The May 31st letter injects no ambiguity, and, if anything, clarifies which clients will be governed by the parties' fifty-fifty fee sharing agreement. In this letter, Ricciardi confirms that only the "personal injury files *identified in my letter of 5/23/96* with the exception of [a client other than Knack who was included in the list], *will be divided on a 50/50 basis.*" (Emphasis added.) Because the excepted client is on the list of clients with "signed contingency fee agreements," the May 31st letter makes it clear that the parties had agreed to a fifty-fifty sharing of fees for all of the remaining contingency fee clients shown on the list, including Knack. The fact that the May 31st letter specifies different arrangements for other clients thus creates no ambiguity with respect to what the parties had agreed to regarding Knack's fee.

¶ 17. In sum, we conclude that the materials submitted on summary judgment produce no genuine dispute regarding any material fact, or any ambiguity, in what the parties agreed to regarding the Knack contingency fee. The trial court correctly concluded that the submissions show, beyond dispute, that Ricciardi offered to share in Knack's fee equally with the Piaskoski firm, and that the offer was accepted at a meeting on May 28th, when both parties compromised any potential

663

claims to more than one-half of Knack's fee, providing consideration for their contract to divide the fee equally.

II.

¶ 18. Ricciardi next asserts that, even if we conclude that he and the Piaskoski firm contracted to divide Knack's fee equally between them, the fee-sharing contract is not enforceable because it violates public policy as expressed in SCR 20:1.5(e). The rule Ricciardi points to reads as follows:

> A division of fee between lawyers who are not in the same firm may be made only if:
>
> (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;
>
> (2) the client is advised of and does not object to the participation of all the lawyers involved and is informed if the fee will increase as a result of their involvement; and
>
> (3) the total fee is reasonable.

SCR 20:1.5(e). The agreement between the firm and Ricciardi to divide Knack's fee equally does not appear to comply with requirement (1) under the rule, given that, upon Ricciardi's departure from the firm, he alone assumed responsibility for Knack's representation and there is no indication that the equal division was "in proportion to the services performed" by each party.

¶ 19. Ricciardi's public policy argument, however, raises a threshold question: Does SCR 20:1.5(e) apply to the fee-division agreement at issue? If it does not, the

664

argument must fail because Ricciardi points to no other source of a public policy that the agreement allegedly violated. We conclude that SCR 20:1.5(e) does not apply to the agreement between Ricciardi and the Piaskoski firm to divide Knack's fee equally between them. This was *not* a fee division "between lawyers who are not in the same firm," but a division between lawyers who were in the same firm when Knack's representation began.[2]

---

[2] Ricciardi's principal argument in this appeal is that the fee-sharing contract is unenforceable because it violates public policy. He correctly points out that public policy "may be expressed by statute, administrative regulation, or by the court's expression of the policy of the common law." *Heyde Cos., Inc. v. Dove Healthcare*, 2002 WI 131, ¶ 10, 258 Wis. 2d 28, 654 N.W.2d 830. Ricciardi contends that SCR 20:1.5(e) defines a public policy of the State of Wisconsin that limits the way in which attorneys may divide attorney fees.

Whether Wisconsin's Rules of Professional Conduct for Attorneys, SCR ch. 20, can be used in this fashion to affect the outcome of civil litigation between two attorneys appears to be a question of first impression. We note that the preamble to the Rules of Professional Conduct for Attorneys instructs as follows:

> The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule.

SCR ch. 20 pmbl. *Cf. Peck v. Meda-Care Ambulance Corp.*, 156 Wis. 2d 662, 669–73, 457 N.W.2d 538 (Ct. App. 1990) (concluding that Wisconsin's Code of Professional Responsibility, predeces-

¶ 20. Ricciardi cites several cases from other jurisdictions where courts voided fee-sharing agreements that he claims were similar to this one as violative of public policy expressed in analogous rules governing attorney conduct. None of the cases Ricciardi relies on, however, involved fee-division agreements between a law firm and a departing associate.[3] Moreover, in cases that are more analogous to this one, courts in other

sor to the Rules of Professional Conduct, cannot be used to define standards of professional care as a basis for civil liability).

Courts in other jurisdictions have held, however, that similar rules regulating attorney conduct have the force of law and have relied on them to void contracts as against public policy. *See, e.g., In re Vrdolyak,* 560 N.E.2d 840, 845 (Ill. 1990) (announcing that in Illinois the Code of Professional Responsibility operates with the force of law); *Holstein v. Grossman,* 616 N.E.2d 1224, 1229 (Ill. App. Ct. 1993) (holding that an oral fee-sharing agreement is unenforceable as a matter of public policy because it violates the Code of Professional Responsibility); *Kaplan v. Pavalon & Gifford,* 12 F.3d 87, 92 (7th Cir. 1993) (same); *but see Freeman v. Mayer,* 95 F.3d 569, 575–76 (7th Cir. 1996) (holding that Indiana Rules of Professional Conduct do not provide grounds for relief from an otherwise valid contract and questioning if the rule would give standing to an attorney because it is intended to protect clients).

Because we conclude that SCR 20:1.5(e) does not apply to a fee-sharing agreement between a law firm and a departing associate, we do not reach the question of whether a violation of SCR 20:1.5(e) either permits or compels a court to void a fee-sharing contract on public policy grounds.

[3] *See Kaplan,* 12 F.3d at 88 (involving referral from sole practitioner to more experienced law firm); *Chambers v. Kay,* 56 P.3d 645, 647–48, 650–52 (Cal. 2002) (involving sole practitioners in separate offices expressly found to not be "associates"); *Kelley v. Donohue,* 907 P.2d 458, 459–60 (Alaska 1995) (involving attorneys in separate law firms); *Belli v. Shaw,* 657 P.2d 315,

jurisdictions have concluded that fee-sharing agreements between a law firm and a departing lawyer do not violate any ethical prohibition against fee division between lawyers who are not "in the same firm." *See, e.g., McCroskey, Feldman, Cochrane & Brock v. Waters*, 494 N.W.2d 826, 828 (Mich. Ct. App. 1993); *Tomar, Seliger, Simonoff, Adourian & O'Brien v. Snyder*, 601 A.2d 1056, 1058–59 (Del. Super. Ct. 1990); *Baron v. Mullinax, Wells, Mauzy & Baab*, 623 S.W.2d 457, 461–62 (Tex. Ct. App. 1981).

¶ 21. The Piaskoski firm claims that Wisconsin precedent is in line with these latter decisions, citing our decision in *Gull v. Van Epps*, 185 Wis. 2d 609, 517 N.W.2d 531 (Ct. App. 1994). The firm asserts that *Gull* supports a conclusion that SCR 20:1.5(e) is inapplicable here because, at the time the fee-sharing agreement was reached, Ricciardi and the Piaskoski firm were resolving fee issues that arose from Ricciardi's future representation of clients who had been clients of the firm during Ricciardi's employment. Put another way, the firm maintains that, although Ricciardi terminated his employment with Piaskoski on or about May 7, 1996, he nevertheless remained "in" the Piaskoski firm for the purposes of SCR 20:1.5(e) until the issues regarding the division of fees for the firm's clients who became Ricciardi's clients were resolved.

¶ 22. We thus turn to *Gull* to see if it offers guidance in resolving the present dispute. We concluded in *Gull* that SCR 20:1.5(e) "does not apply to the division of fees in concluding the affairs of a partnership because, until that process is completed, the lawyers are in the same firm." *Gull*, 185 Wis. 2d at 616. Our

316 (Wash. 1983) (same); *Ford v. Albany Med. Ctr.*, 283 A.D.2d 843, 843–44 (N.Y.A.D. 2001) (same); *Post v. Bregman*, 707 A.2d 806, 808–10 (Md. Ct. App. 1998) (same).

conclusion in *Gull* was largely grounded in partnership law and, in particular, on the recognition that, under WIS. STAT. § 178.25(2), a partnership is not terminated upon dissolution, "but continues until the winding up of partnership affairs is completed." *Id*. Ricciardi thus contends, and we acknowledge, that *Gull* is not necessarily controlling on the present facts. We nonetheless conclude that our analysis in *Gull* is instructive and applicable here, even in the absence of a partnership and the inapplicability of partnership law to this dispute.

¶ 23. All facets of the relationship between Ricciardi and the Piaskoski firm did not end abruptly the instant Ricciardi gave notice on May 7, 1996, that he was terminating his employment. Discussion between the parties regarding the terms of Ricciardi's separation from the firm, as evidenced by the correspondence we have described, continued through the end of May. We conclude that, as long as the issue of how to apportion fees received in the future for clients whose representation began while Ricciardi was associated with the firm remained unresolved, the parties were, like the partners in *Gull*, lawyers "in the same firm" within the meaning of SCR 20:1.5(e). Thus, SCR 20:1.5(e) does not apply to the parties' May 28th agreement to divide Knack's fee equally between them.[4]

---

[4] Ricciardi asserts in his reply brief that "[e]very law partnership in Wisconsin would be extremely surprised to learn that it is in effect dissolved and must wind up its business every time an employee/associate, as contrasted with a partner/shareholder, leaves, quits, is laid off or fired." Although we accept Ricciardi's point that it is perhaps not uncommon for associates to leave law firms, taking with them clients and cases acquired or developed during the associates' tenure with the firms, we fail to see how our conclusion could be interpreted to mean that the firm must

¶ 24. Our conclusion that, under the analysis in *Gull*, SCR 20:1.5(e) should be deemed inapplicable to the present facts finds support in other provisions and comments contained in SCR ch. 20, as well as from the purpose, origins and historical development of SCR 20:1.5(e) as it presently reads. For example, the comment following SCR 20:1.10, where "firm" is defined for the "purposes of the Rules of Professional Conduct," notes that "[w]hether two or more lawyers constitute a firm . . . can depend on the specific facts . . . . Furthermore, it is relevant in doubtful cases to consider the underlying purpose of the rule that is involved. A group of lawyers could be regarded as a firm for purposes of [one rule but not another]." The rationale behind SCR 20:1.5(e) and similar rules has been identified as follows:

> The traditional prohibition of fee-splitting among lawyers is justified primarily as preventing one lawyer from recommending another to a client on the basis of the referral fee that the recommended lawyer will pay, rather than the lawyer's qualifications. The prohibition has also been defended as preventing overcharging that may otherwise result when a client pays two lawyers

---

dissolve or "wind up its business" when this occurs. Rather, we are concluding only that, for purposes of the applicability of SCR 20:1.5(e), any fee-sharing agreements struck between the firm and the departing associate that relate to transitioning clients are agreements between lawyers "in the same firm." We think it more likely that Wisconsin law firms and associates would be surprised to learn, had we reached the opposite conclusion, that they face disciplinary sanctions for failing either to strictly divide fees "in proportion to services performed" or to maintain "joint responsibility" for the future representation of a client, notwithstanding the parting of their ways.

and only one performs services. Beyond that, the prohibition reflects a general hostility to commercial methods of obtaining clients.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 47 cmt. b (2000).

¶ 25. The agreed upon fifty-fifty division of Knack's fee in this case does not involve any of the ills the rule seeks to prevent. The Piaskoski firm did not refer Knack to Ricciardi because of Ricciardi's willingness to split Knack's fee. Rather, Knack simply followed his lawyer out of the firm with whom the lawyer had been practicing when the representation arose. Similarly, there is no indication that Knack's total fee was higher simply because of the agreement to divide it equally between Ricciardi and his former firm. According to Ricciardi's May 23rd letter, Knack and the other identified clients had already "signed contingency fee agreements," and nothing in the record suggests that the fee was revised upward after Ricciardi and the firm agreed to divide Knack's fee equally. In short, SCR 20:1.5(e) is intended to address problems that are simply not presented when formerly associated attorneys part company and reach agreements for dividing fees for pending matters that originated during their association.[5]

---

[5] The Michigan Court of Appeals reached a similar conclusion in *McCroskey, Feldman, Cochrane & Brock v. Waters*, 494 N.W.2d 826 (Mich. App. 1993):

With regard to MRPC [Michigan Rules of Professional Conduct] 1.5(e), it is arguable that . . . the [present] agreement provides for "a division of a fee between lawyers who are not in the same firm." However, we interpret the court rules in accordance with the intent and purpose behind them. MRPC 1.5(e) is designed to prohibit brokering, to protect a client from clandestine payment and employment, and to prohibit aggrandizement of fees. Plainly,

¶ 26. As to the history of the present SCR 20.1.5(e), Wisconsin's supreme court rules governing the conduct of attorneys has generally followed the American Bar Association's (ABA) model rules and revisions to them. When the ABA adopted its Model Code of Professional Responsibility in 1969, the forerunner of the current ABA Model Rules of Professional Conduct, Wisconsin followed suit. *See Code of Prof'l Responsibility*, 43 Wis. 2d vii (1970). With regard to the division of fees, Wisconsin adopted the following disciplinary rule, which was identical to the ABA Model Code provision:

> (A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his or her law firm or law office, unless:
>
> > (1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
> >
> > (2) The division is made in proportion to the services performed and responsibility assumed by each.
> >
> > (3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.
> >
> > *(B) This Disciplinary Rule does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement.*

none of these concerns is implicated in this case. The agreement is simply a mechanism for dividing an already existing fee. In other words, this is not a referral situation contemplated by the rule. Instead, the contract simply seeks to obviate time-consuming squabbles that formerly arose when plaintiff's entitlement to its fair share of any fee generated by a departing client's file was determined on a quantum merit basis. We agree with plaintiff that such arrangements, as long as they are reasonable, should be encouraged.

*Id.* at 828 (citations and footnote omitted).

*Code of Prof'l Responsibility* DR 2–107, 43 Wis. 2d at xxix (emphasis added); *see* MODEL CODE OF PROF'L RESPONSIBILITY DR 2–107 (1969).

¶ 27. In 1983, the ABA replaced its Model Code of Professional Responsibility with the Model Rules of Professional Conduct, and Wisconsin again followed suit by replacing the former Code of Professional Responsibility with the Rules of Professional Conduct for Attorneys, patterned after the new ABA Rules. *See In re Amendment of Supreme Court Rules*, 139 Wis. 2d xiii (1988). The new fee division restrictions in both ABA Model Rule 1.5(e) and its Wisconsin counterpart, SCR 20:1.5(e), no longer contained the express exclusion of former DR 2–107(B) for "payment to a former partner or associate pursuant to a separation or retirement agreement." *See In re Amendment of Supreme Court Rules*, 139 Wis. 2d at xxxiii; *Committee Completes Review of ABA Rules of Conduct*, WIS. BAR BULLETIN 60, 63 (Nov. 1984).

¶ 28. We have found nothing in the explanatory notes or comments to the 1983 ABA Model Rules or Wisconsin's 1988 adoption of them that would indicate that the deletion of this exclusion was intended to make the fee division rule applicable to the division of fees for pending matters between law firms and departing attorneys. *See Committee Completes Review of ABA Rules of Conduct*, WIS. BAR BULLETIN 60, 63 (Nov. 1984); Truman McNulty, *The Code of Professional Responsibility in Wisconsin*, WIS. BAR BULLETIN 16, Feb. 1985; ABA, A LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT, 1982–1998, 38–42 (1999). Moreover, we note that, in 2002, the ABA added the following sentence as part of the official commentary to Model Rule 1.5: "Paragraph (e) does not prohibit or regulate division of fees to be received in the

future for work done when lawyers were previously associated as a firm." ABA, THE 2002 CHANGES TO THE ABA MODEL RULES OF PROFESSIONAL CONDUCT 17 (2003). Although Wisconsin has not yet adopted this additional comment, we have no reason to believe that it does not accurately describe the intended scope of SCR 20:1.5(e).[6]

## III.

¶ 29. We next take up the Piaskoski firm's cross-appeal. The firm argues that the trial court erroneously exercised its discretion on two occasions: when it denied the Piaskoski firm's request to amend its complaint under WIS. STAT. § 802.09(1),[7] and when it re-

---

[6] We note as well that the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 47 (2000), entitled "Fee-Splitting Between Lawyers Not In The Same Firm," is similar in content to both ABA Model Rule 1.5(e) and SCR 20:1.5(e). The Restatement commentary to § 47 explains that the section does not apply to "[l]awyers in the same firm," and thus does not affect agreements for the division of fees with "former partners or associates." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 47 cmt. g (2000) ("Under this Section, law-firm members may also share fees in making payments to former partners or associates under a separation or retirement agreement and may distribute fees among members of a dissolved firm for post-dissolution work arising from matters entrusted to the firm before its dissolution.").

[7] WISCONSIN STAT. § 802.09(1) provides in relevant part as follows:

A party may amend the party's pleading once as a matter of course at any time within 6 months after the summons and complaint are filed or within the time set in a scheduling order under s. 802.10. Otherwise a party may amend the pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given at any stage of the action when justice so requires.

673

versed on reconsideration an earlier decision to award the firm attorney fees incurred in this litigation. We affirm both rulings.

The law firm filed suit on December 28, 2001. After the trial court granted its summary judgment motion on October 7, 2002, the firm requested leave to amend its complaint to assert a claim for breach of the fee-sharing agreement with respect to five additional cases not pled in the original complaint. The trial court denied the motion, stating:

> You know, in fairness to the defense . . . I'm going to deny the request for an accounting of these additional five for the following reasons: . . . There was a scheduling conference held . . . . Mr. Ricciardi was there representing himself. [Counsel was] there for the plaintiff. There was a deadline set for amending pleadings and naming additional parties, the pertinent part being the amending pleadings. That deadline has long since passed. It was July 15 of '02. There's no reading of the plaintiff's complaint in this case that would include a request for accounting of files other than those named. I've read and re-read the plaintiff's complaint numerous times here, and there's nothing in there making that request. Everybody's had their deadline for dispositive motion filing. That was August 12. You did bring a motion to compel because the defendant, according to your motion, was not cooperating with discovery, but there is, at least in my reading of your motion to compel . . . nothing in it that supports your request for accounting of five of the files, so what's fair is fair. You didn't plead it. You didn't ask for it. I'm not ordering the accounting on those.

The trial court also denied the firm's subsequent motion for reconsideration, finding that "the matter is not going to be held open for the in[clusion] of those other matters. They weren't pled. My ruling stands on that."

¶ 30. "A trial court's decision to grant leave to amend a complaint is discretionary." *Finley v. Culligan*, 201 Wis. 2d 611, 626, 548 N.W.2d 854 (Ct. App. 1996). We will not reverse a trial court's discretionary decision unless the record discloses that the court failed to exercise its discretion, that the facts do not support the decision, or that the court applied the wrong legal standard. *See id.* at 626–27. The trial court "in exercising its discretion must balance the interests of the party benefiting by the amendment and those of the objecting party." *State v. Peterson*, 104 Wis. 2d 616, 634, 312 N.W.2d 784 (1981).

¶ 31. When a motion to amend the complaint is filed after a motion for summary judgment has been granted, as happened here, there is no presumption in favor of allowing the amendment. *Mach v. Allison*, 2003 WI App 11, 27, 259 Wis. 2d 686, 656 N.W.2d 766. "Rather, the party seeking leave to amend must present a reason for granting the motion that is sufficient, when considered by the trial court in the sound exercise of its discretion, to overcome the value of the finality of judgment." *Id.* The reasons for not acting sooner, the amount of time passed since filing the original complaint, the number and nature of prior amendments, and the nature of the proposed amendment are all relevant considerations, as is the effect on the defendant. *Id.*

¶ 32. The Piaskoski firm contends that Ricciardi possessed sole knowledge of the additional clients for whom it wished to recover fees, and that his failure to disclose their existence deprived it of an opportunity to obtain relief. The firm cites *John v. John*, 153 Wis. 2d 343, 450 N.W.2d 795 (Ct. App. 1989), where we affirmed

a trial court's allowance of an amendment because the defense withheld information, contributing to the plaintiff's late amendment. *Id.* at 365. The amendment in *John,* however, did not come after summary judgment had been granted to the plaintiff, as is the case here. We conclude that *John* is thus distinguishable and that the guidance in *Mach* is controlling. Moreover, because whether to allow a belated amendment is a discretionary decision of the trial court, our affirmance of a decision to grant leave in one case does not mean that we must reverse a decision to deny leave in another, even if the facts were similar. *See Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981) (noting that "a trial court in an exercise of discretion may reasonably reach a conclusion which another judge or another court may not reach").

¶ 33. Ricciardi parted company with the Piaskoski firm in May 1996, and the firm contends that it was unaware of the additional clients until October 2002. When asked by the trial court why it could not have obtained this information sooner, the firm's attorney replied: "Well, [we] could have, Judge, but quite frankly, we were relying on this May 23 letter that listed, in Mr. Ricciardi's words, the cases that he took." When asked by the trial court to explain why, if these files originated with the Piaskoski firm, the firm couldn't ascertain which files Ricciardi took simply by examining its own files, counsel replied that it "could have, but for the fact that Mr. Ricciardi had all of the files, the paper files, with him." The firm did not dispute, however, the trial court's subsequent comment that it must have had "at least index card files in [the] office."

¶ 34. We thus cannot conclude that the trial court erred in determining that the firm failed to present sufficient reason to justify its failure to act sooner to

amend its complaint. The law firm has provided no sufficient explanation, either here or in the trial court, why the firm could not have ascertained the names of all of its former clients who became Ricciardi's clients long before it prevailed in obtaining summary judgment to recover a portion of the Knack fee. We are satisfied that the trial court did not erroneously exercise its discretion in denying the firm's belated request to amend its complaint.

¶ 35. Finally, we also affirm the trial court's ultimate decision denying the firm its actual attorney fees incurred in pursuing this litigation. At the summary judgment hearing, the trial court granted the firm's request for attorney fees, concluding that "none of the defenses asserted by [Ricciardi] or his counterclaims were meritorious." The court ordered that the law firm was "entitled to actual attorney's fees subject to the Court's approval." The trial court explained that "[t]his is not a request for [fees for responding to a] frivolous [defense] . . . . The Court is finding that the plaintiff is entitled to actual attorney's fees [for] having succeeded on [its] claim, and based on the Court's ruling against [Ricciardi] on [his] defenses and . . . counterclaim, but not frivolous."

¶ 36. Ricciardi moved the trial court to reconsider its decision to award actual attorney fees. The court did so and reversed its previous order:

> I was wrong. Mr. Ricciardi is absolutely right. The American Rule does not permit reasonable attorneys fees to the victor in this kind of a suit because there isn't a statute, and there was no provision in the contract . . . . and I have searched the case law myself beyond the cases provided by both lawyers, and although I did find [one case] which does provide for reasonable attorneys fees in the event that the Court

finds that the efforts of counsel .... showed obdurate behavior, I think that's more analogous to a frivolous finding, and I specifically found that this was not frivolous. I know that that's vexing to [the law firm] that I found it not to be frivolous. I just couldn't say that Mr. Ricciardi's position lacked any basis in law. It doesn't go to that extreme, and it's not frivolous.

¶ 37. The firm maintains that the trial court's second ruling was incorrect because the "American Rule" does not apply where a statutory provision, such as WIS. STAT. § 802.05(1), authorizes "reasonable attorney fees" as a sanction for certain conduct of an opposing party or counsel. Nothing in the trial court's initial ruling, however, suggests that § 802.05(1) was the basis for its decision to award attorney fees, and the court expressly disavowed any finding of frivolousness under WIS. STAT. § 814.025, which was the basis on which the firm had requested attorney fees.

¶ 38. The trial court correctly concluded on reconsideration that the "American Rule" precludes an award of attorney fees in this case.[8] There was no provision in the parties' contract for awarding attorneys fees in the event of litigation over the division of fees. The only possible statutory bases cited by the firm for an attorney fee award in this case are WIS. STAT. §§ 802.05(1) and 814.025, but an award under neither is supported by any findings in the record. Finally, we agree with the trial court's assessment that, although Ricciardi's de-

---

[8] Wisconsin follows the "American Rule" under which "parties to litigation are generally responsible for their own attorney's fees unless recovery is expressly allowed by either contract or statute, or when recovery results from third-party litigation." *DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 571, 547 N.W.2d 592 (1996).

fenses to the firm's action were not meritorious, neither were they entirely frivolous. Ricciardi's argument that SCR 20:1.5(e) bars enforcement of the parties' agreement to divide fees was not "without any reasonable basis in law or equity." Section 814.025(3)(b).

## CONCLUSION

¶ 39. For the reasons discussed above, we affirm the appealed judgment.

*By the Court.*—Judgment affirmed.