COURT OF APPEALS
DECISION
DATED AND FILED

June 27, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2018AP508**

**STATE OF WISCONSIN**

Cir. Ct. No.  2016CV2806

**IN COURT OF APPEALS
DISTRICT IV**

---

WILMINGTON SAVINGS FUND SOCIETY FSB,

    PLAINTIFF-RESPONDENT,

 V.

ALISHA B. AYRES AND WILLIAM R. AYRES, JR.,

    DEFENDANTS-APPELLANTS.

---

APPEAL from a judgment of the circuit court for Dane County: FRANK D. REMINGTON, Judge. *Affirmed*.

Before Lundsten, P.J., Kloppenburg and Fitzpatrick, JJ.

¶1     KLOPPENBURG, J.     This case arises from a foreclosure action filed by Wilmington Savings Fund Society FSB against Alisha and William Ayres. At issue on appeal are counterclaims asserted by the Ayreses against Wilmington, which are premised on Wilmington's handling of the Ayreses' application for a

loan modification prior to the commencement of the foreclosure action. The Ayreses assert that Wilmington's handling of their loan modification application breached Wilmington's contractual duty of good faith and fair dealing. In addition, the Ayreses assert that Wilmington also violated the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601-17 (2012),[1] in handling the loan modification application. Both the duty of good faith and fair dealing claim and the RESPA claim were tried to a jury.

¶2     The questions presented on appeal are: (1) whether the circuit court erred by overturning the jury's verdict awarding the Ayreses damages for Wilmington's breach of the duty of good faith and fair dealing; (2) whether the court erred by declining to change the jury's negative answer to a special verdict question asking whether Wilmington violated RESPA in its handling of the Ayreses' loan modification appeal; and (3) whether the court erred by allowing Wilmington's corporate representative to testify based on notes he had prepared for trial summarizing Wilmington's business records without also producing those records.

¶3     As to the first issue, we conclude that the circuit court properly overturned the jury's verdict on the duty of good faith and fair dealing claim. In doing so, we explain that the Ayreses have not shown that a contract existed between them and Wilmington under which Wilmington had a duty of good faith and fair dealing with respect to the Ayreses' loan modification application. As to the second issue, we conclude that the court correctly declined to change the jury's special verdict answer concerning the loan modification appeal because credible

---

[1] All references to the United States Code are to the 2012 version unless otherwise noted.

evidence supports the jury's verdict. Finally, as to the third issue, we assume without deciding that the court erred by permitting Wilmington's representative to testify based on his notes of Wilmington's business records without producing those records, but we conclude that the error was harmless. Accordingly, we affirm.

## BACKGROUND[2]

¶4     The Ayreses purchased a house in Sun Prairie, Wisconsin in 1999. In 2006, the Ayreses refinanced and executed a Note and Mortgage secured by the house, which were subsequently transferred to Wells Fargo Bank. In 2010, the Ayreses executed a loan modification agreement with Wells Fargo. The Note, Mortgage, and 2010 modification together have governed the Ayreses' loan at all times pertinent to this appeal, and we will refer to these items collectively as "the loan." Wells Fargo sold the loan to Wilmington on February 19, 2016, and two different servicers serviced the loan for Wilmington thereafter.[3]

---

[2] In their brief-in-chief, the Ayreses with few exceptions cite to their appendix and do not provide citations to the record. This is a violation of an important statutory requirement. On appeal, a party must include appropriate factual references to the record in its briefing. WIS. STAT. RULE 809.19(1)(d)–(e). The appendix is not the record. *United Rentals, Inc. v. City of Madison*, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322. This is no minor matter. An appendix is a helpful tool when panel judges conduct an initial review of the briefs and, therefore, parties typically provide appendix cites, as the Ayreses do here. But, when the case is assigned for drafting, we look directly to the record to verify factual assertions in a brief. The absence of record cites forces us to look to the appendix to determine where to look in the record. We warn counsel that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2).

[3] According to the testimony at trial, a loan "servicer" is responsible for managing disbursements and payments, escrow, tax, and insurance for the loan, as well as for assisting clients through "loss mitigation attempts." The parties do not dispute that Wilmington is legally responsible for the actions of the servicers at issue in this case. The parties generally refer to Wilmington when discussing the actions taken by the servicers with respect to the loan after February 19, 2016, and we do the same.

¶5 The Ayreses stopped making the monthly payments required under the terms of the loan in June 2015. The Ayreses applied for a loan modification in 2016. In response to the Ayreses' loan modification application, Wilmington offered a "Trial Modification Plan," which provided that if the Ayreses made four specified monthly payments and complied with certain other conditions, Wilmington would consider a permanent loan modification. Shortly after receiving the Trial Modification Plan, the Ayreses sent Wilmington an appeal form stating that they could not afford the monthly payments proposed in the Trial Modification Plan. Wilmington ultimately rejected the Ayreses' loan modification application and appeal in August 2016. We review pertinent details relating to the Ayreses' loan modification application and appeal in the discussion section that follows.

¶6 Wilmington filed the present foreclosure action in October 2016. The Ayreses asserted multiple defenses to the foreclosure and multiple counterclaims. Relevant to this appeal, the Ayreses' counterclaims alleged that Wilmington's handling of the Ayreses' loan modification application and appeal violated both RESPA and Wilmington's contractual duty of good faith and fair dealing.

¶7 The circuit court entered a judgment of foreclosure in favor of Wilmington. The court held a jury trial on the counterclaims, and the jury returned the following special verdict:[4]

> QUESTION NO. 1: Did Wilmington fail to exercise reasonable diligence in obtaining documents and information from the Ayres[es] to complete their

---

[4] Question Nos. 1 through 4 relate to violations under RESPA.

application for loan modification in and after February 2016?

Answer: Yes

QUESTION NO. 2:  Did Wilmington fail to provide prompt notice to the Ayres[es] that their application was incomplete?

Answer: No

QUESTION NO. 3:  Did Wilmington, within 30 days of the application being complete, fail to review the Ayres[es'] application and notify them of any loss mitigation option they would be offered?

Answer: No

QUESTION NO. 4:  Did Wilmington fail to process the Ayres[es'] appeal according to the applicable provisions of RESPA?

Answer: No

….

QUESTION NO. 7:  Did Wilmington breach its duty of good faith and fair dealing with respect to the Ayres[es]?

Answer: Yes

The jury awarded $15,000 in damages for Wilmington's failure to diligently obtain documents and information (Question No. 1) and awarded $75,000 in damages on the claim of breach of the duty of good faith and fair dealing (Question No. 7).

¶8     In ruling on the parties' various post-verdict motions, the circuit court overturned the jury's verdict determining that Wilmington breached its duty of good faith and fair dealing, and left unchanged the jury's answers to the remaining special verdict questions.  The Ayreses appeal.

**DISCUSSION**

¶9 The Ayreses raise three issues on appeal. We address and reject each of the Ayreses' arguments in turn.

*I. Breach of the Duty of Good Faith and Fair Dealing*

¶10 The Ayreses argue that Wilmington breached its contractual duty of good faith and fair dealing (which we will refer to as the duty of good faith) in its handling of the Ayreses' loan modification application by: (1) making conflicting and repetitive requests regarding documentation to support their loan modification application; (2) offering unaffordable Trial Modification Plan terms in response to their application; and (3) giving the Ayreses only three days to accept the Trial Modification Plan terms.[5] As we explain, the Ayreses' argument fails because they do not establish a prerequisite for their breach of the duty of good faith claim, namely, a contract from which that duty arises.

¶11 We first summarize the applicable legal principles and standard of review. We then explain that the Ayreses have failed to show that Wilmington had a contractual duty to exercise good faith in handling the Ayreses' loan modification application, and we conclude that the circuit court properly

---

[5] The Ayreses also appear to assert that Wilmington breached its duty of good faith by refusing to accept payments from the Ayreses while the loan modification application was ongoing. However, the Ayreses do not develop a supporting argument as to why this action breached Wilmington's duty of good faith, nor do they in their reply brief respond to Wilmington's counterargument that the terms of the loan explicitly permitted Wilmington to "accelerate" the loan and refuse to accept monthly payments if the Ayreses fell behind on their monthly payments. Accordingly, we do not consider this assertion further. *See **Fischer v. Wisconsin Patients Comp. Fund***, 2002 WI App 192, ¶1 n.1, 256 Wis. 2d 848, 650 N.W.2d 75 ("An argument asserted by a respondent on appeal and not disputed by the appellant in the reply brief is taken as admitted.").

overturned the jury's verdict on the Ayreses' breach of the duty of good faith claim.

*A. Applicable Law and Standard of Review*

¶12 The duty of good faith is not amenable to precise definition, but previous Wisconsin courts have summarized it thus:

> Parties to a contract have a duty of good faith to each other.… [I]t may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out.... Moreover, there is an implied undertaking in every contract on the part of each party that he [or she] will not intentionally and purposely do anything to prevent the other party from carrying out his [or her] part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

***Metropolitan Ventures, LLC v. GEA Assocs.***, 2006 WI 71, ¶35, 291 Wis. 2d 393, 717 N.W.2d 58, *opinion clarified on denial of reconsideration*, 2007 WI 23, 299 Wis. 2d 174, 727 N.W.2d 502 (citations and quoted source omitted).

¶13 In order to assert that Wilmington breached its contractual duty of good faith, the Ayreses must establish the existence of a contract between them and Wilmington from which Wilmington's obligation to process the Ayreses' loan modification application in good faith arose; in other words, the contractual duty of good faith cannot be breached in the absence of a valid contract between the parties. *See id.*, ¶¶35-36 ("[C]ontracts impose on the parties" a duty of good faith, and "[t]he duty of good faith arises because parties to a contract, once executed, have entered into a *cooperative relationship*."); *see also **Beidel v. Sideline Software, Inc.***, 2013 WI 56, ¶27, 348 Wis. 2d 360, 842 N.W.2d 240 ("Every contract implies good faith and fair dealing between the parties to it." (quoting ***Chayka v. Santini***, 47 Wis. 2d 102, 107 n.7, 176 N.W.2d 561 (1970))); ***Hauer v.***

*Union State Bank of Wautoma*, 192 Wis. 2d 576, 596-97, 532 N.W.2d 456 (Ct. App. 1995) (statute requiring good faith "applies only to the performance or enforcement of a contract, it does not impose a duty of good faith in the negotiation and formation of contracts"). The party claiming breach of a contractual duty "must establish the existence of the contract" from which the duty arises. *VanHierden v. Swelstad*, 2010 WI App 16, ¶11, 323 Wis. 2d 267, 779 N.W.2d 441.

¶14 As elaborated below, the Ayreses argue that a contract existed between them and Wilmington from which Wilmington had a duty to process their loan modification application in good faith. In evaluating this argument, our standard of review is twofold. We will not overturn a jury's answer to a special verdict question based on an error of fact if any credible evidence supports the verdict. *State v. Abbott Labs.*, 2012 WI 62, ¶27, 341 Wis. 2d 510, 816 N.W.2d 145. Thus, in the first part of our analysis, we review whether the facts that the Ayreses assert gave rise to the purported contract are supported by any credible evidence, and we explain why they do not.

¶15 We then proceed to the second part of our analysis, to fully respond to the parties' arguments, and we examine whether the facts asserted by the Ayreses, even if supported by credible evidence, are sufficient to show the existence of a contract. This presents a question of law that we review de novo. *See Piaskoski & Assocs. v. Ricciardi*, 2004 WI App 152, ¶7, 275 Wis. 2d 650, 686 N.W.2d 675 ("Where the material facts are undisputed, … the existence … of a contract [is] a question of law which we decide de novo."). We explain why we reject the Ayreses' argument that we should answer this question in the affirmative.

*B. Whether Wilmington Had a Duty of Good Faith*

¶16    Here, the Ayreses concede that Wilmington had no obligation under the terms of the contract comprising the loan to process the loan modification application in any particular way. Instead, they argue that the trial evidence supported a jury finding that Wilmington had a contractual duty to process their loan modification application in good faith because "Wilmington suggested [that] they submit [a loan modification application]" and "the Ayreses took [Wilmington] up on the proposition." That is, according to the Ayreses, these two events—the solicitation to apply, and the attempt to apply—created the contract from which the duty of good faith arose.

¶17    There are two problems with the Ayreses' argument. The first problem is evidentiary. Nowhere do the Ayreses cite to trial evidence supporting a finding that Wilmington "suggested" that the Ayreses apply for a modification, or that Wilmington in any way initiated a loan modification process. This lack of supporting citations to trial evidence alone defeats the Ayreses' argument. *See Jensen v. McPherson*, 2004 WI App 145, ¶6 n.4, 275 Wis. 2d 604, 685 N.W.2d 603 ("It is not this court's responsibility to sift and glean the record in extenso to find facts supporting [the party's] argument."); *State v. McMorris*, 2007 WI App 231, ¶30, 306 Wis. 2d 79, 742 N.W.2d 322 (court of appeals may "choose not to consider … arguments that lack proper citations to the record").

¶18    Moreover, apart from the Ayreses' failure to point to trial evidence, our review of the trial record reveals no evidence indicating that Wilmington "suggested" or otherwise solicited the Ayreses to apply for a loan modification. Alisha Ayres testified only that she believed Wilmington acquired the loan in February 2016, and that after Wilmington had acquired the loan, the Ayreses

"appl[ied] for a new loan modification with Wilmington." Neither Alisha Ayres's testimony, nor any of the other trial testimony or exhibits, indicate that Wilmington solicited the Ayreses to apply for a loan modification. Indeed, to the extent the trial evidence provides any insight, it suggests that it was the Ayreses, not Wilmington, who initiated discussion of the loan modification. For instance, the earliest correspondence from Wilmington to the Ayreses that was admitted into evidence was a letter that Alisha Ayres testified she received in late March, 2016, which stated that Wilmington was "follow[ing] up … on [the Ayreses'] recent request for loan assistance." Alisha Ayres testified that she received the letter "after submitting the documents for loan modification." A reasonable inference from this evidence is that the Ayreses applied for a loan modification, and Wilmington responded. Thus, the Ayreses fail to establish the factual basis for the premise of their contractual duty of good faith argument.

¶19    While our analysis could stop here, in light of the parties' extensive briefing on the issue and for the sake of thoroughness, we briefly address the second problem with the Ayreses' argument, which is that they do not cite any Wisconsin authorities that support their argument that the two alleged events—Wilmington's solicitation to apply for a loan modification, and the Ayreses' subsequent attempt to apply—create a contract.

¶20    As an initial point, we note that the Ayreses have not developed any argument that the two events they rely on satisfy the elements of contract formation. *See, e.g.*, ***Piaskoski & Assocs.***, 275 Wis. 2d 650, ¶7 ("A valid contract requires an offer, acceptance and consideration."). As explained above, in the absence of a valid contract between the Ayreses and Wilmington, Wilmington could have no duty of good faith to process the Ayreses' loan modification application in any particular way. *See, e.g.*, ***Metropolitan Ventures***, 291 Wis. 2d

10

393, ¶¶35-36 ("*contracts* impose on the parties" a duty of good faith (emphasis added)). Thus, because the Ayreses have not explained how the two events they rely on establish a contract under the relevant standard, they have failed off the bat to show that Wilmington had any duty of good faith with respect to their loan modification application.

¶21 The Ayreses attempt to circumvent this defect in their argument by citing numerous cases which, they assert, support their argument that the duty of good faith "applies to [loan] modification efforts." However, with one exception, the cases cited by the Ayreses are all lower federal court decisions, most of which are unpublished. Thus, they do not alter the analysis of the Wisconsin law discussed above, which, as we have explained, requires the Ayreses to show the existence of a contract with Wilmington in order to claim that Wilmington breached its duty of good faith. *See City of Weyauwega v. Wisconsin Cent. Ltd.*, 2018 WI App 65, ¶12 n.4, 384 Wis. 2d 382, 919 N.W.2d 609 (federal district and circuit court decisions do not bind us). In any event, none of the cases support the specific proposition, essential to the Ayreses' argument, that the twin events of a solicitation to apply for a loan modification and a subsequent attempt to apply create a contract.

¶22 The sole Wisconsin authority cited by the Ayreses is *Wisconsin Nat. Gas Co. v. Gabe's Constr. Co.*, 220 Wis. 2d 14, 582 N.W.2d 118 (Ct. App. 1998). In that case, Wisconsin Natural Gas was deemed to have breached its contractual duty of good faith when it failed to timely alert Gabe's Construction that it intended to make a claim under the indemnification clause of the contract between the two companies. *Id.* at 16-19. We held that, although the contract terms did not explicitly require Wisconsin Natural Gas to give notice of the claim, because Wisconsin Natural Gas had on previous occasions done so, and because it had in

11

fact assured Gabe's Construction that it did not intend to make a claim in the case at hand, it had breached its duty of good faith by failing to give timely notice. *Id.* at 21-24.

¶23 *Wisconsin Natural Gas* does not help the Ayreses for at least two reasons. First, in that case, the duty of good faith arose from the original contract between the parties, and was not the product of a new contract formed during the modification process. *See id.* at 24 (analyzing whether duty of good faith was breached under the "indemnification clause of the contract"). In contrast, the Ayreses have conceded that the original contract here does not impose a duty of good faith on Wilmington with respect to the loan modification application. Second, *Wisconsin Natural Gas* says nothing about whether a contract may be formed by a solicitation to apply for a contract modification coupled with an attempt to modify the contract. It thus does not support the Ayreses' premise that a new contract was formed during the modification application process here.

¶24 Because the Ayreses have not provided any legal authority supporting the proposition that a solicitation to apply for a loan modification coupled with an attempt to apply create a contract, we do not consider their argument to that effect any further.

¶25 In sum, the Ayreses' argument that a new contract was formed when Wilmington "suggested" that the Ayreses apply for a loan modification and they subsequently attempted to apply for a loan modification fails. It follows that the circuit court properly overturned the jury's answer to the good faith and fair dealing question.

## II. *Special Verdict Question Number Four*

¶26 The Ayreses next argue that the circuit court erred by declining to change the jury's answer to special verdict question number four. The standard to be applied is whether any credible evidence supports the jury's verdict. *See* ***Foseid v. State Bank of Cross Plains***, 197 Wis. 2d 772, 787, 541 N.W.2d 203 (Ct. App. 1995) (any-credible-evidence standard applies to motions to change the jury's answer to a special verdict question). Moreover, where, as here, the circuit court has approved the jury's verdict on motions after the verdict, we give even greater deference to the verdict and will not overturn it unless "there is such a complete failure of proof that the verdict must be based on speculation." ***Kuklinski v. Rodriguez***, 203 Wis. 2d 324, 331, 552 N.W.2d 869 (Ct. App. 1996).

¶27 Special Verdict Question No. 4 asked the jury to answer whether Wilmington failed "to process the Ayres[es]' appeal according to the applicable provisions of RESPA." RESPA generally provides that borrowers have a right to appeal a "determination to deny a … loss mitigation application." 12 C.F.R. § 1024.41(h) (2019);[6] *see also* 12 C.F.R. § 1024.1 (implementing RESPA). RESPA also imposes certain obligations on lenders in handling such an appeal. *See* 12 C.F.R. § 1024.41(h)(3)–(4). We need not decide whether these RESPA requirements were met in this circumstance because we conclude that the RESPA requirements do not apply to the Ayreses' appeal.

¶28 The parties agree that the RESPA requirements would not apply if the Ayreses appealed the terms of the Trial Modification Plan, because the Trial

---

[6] All references to the Code of Federal Regulations are to the 2019 version unless otherwise noted.

13

Modification Plan was not a "determination to deny" the Ayreses' application, but was instead an approval of the Ayreses' application, albeit on terms the Ayreses considered too stringent. *See* 12 C.F.R. § 1024.41(h). On the other hand, the parties also agree that these RESPA requirements *would* apply if the Ayreses appealed a different determination from Wilmington, which we will refer to as "the HAMP denial" and which informed the Ayreses that Wilmington had denied them a "HAMP modification," because that *was* a "determination to deny" the Ayreses' application.

¶29 The narrow question presented, therefore, is whether the Ayreses appealed the terms of the Trial Modification Plan or the HAMP denial. Accordingly, we review the trial evidence to determine if any credible evidence supports a finding that the Ayreses appealed the terms of the Trial Modification Plan.

¶30 The trial evidence provides the following relevant background. Wilmington sent the Ayreses two separate correspondences dated August 1, 2016. The first correspondence stated that Wilmington had approved the Ayreses for a "Standard Modification" of the loan, but had denied the Ayreses a "HAMP Modification." This HAMP denial informed the Ayreses that they had a right to appeal the decision and attached a form entitled "Loan Modification Appeal Form." The second correspondence was the Trial Modification Plan, mentioned above, which, to repeat, provided that Wilmington would consider the Ayreses for a permanent loan modification if they made four monthly payments and met other requirements.

¶31 The Ayreses sent Wilmington a completed Loan Modification Appeal Form dated August 11, 2016. On the appeal form, the Ayreses wrote that

they were "writing to appeal the loan modification plan that is attached to this letter" and that they believed they would not be able to afford the monthly payments proposed in the Trial Modification Plan. The Ayreses attached only the Trial Modification Plan to the Appeal Form. In a letter dated August 30, 2016, Wilmington informed the Ayreses that it did not approve their "request for loan assistance" because they had "refused [the] Modification Terms Offered."

¶32 We conclude that there is ample evidence in the trial record to support a finding that the Ayreses appealed only the terms of the Trial Modification Plan. For instance, as stated above, the appeal form submitted by the Ayreses stated that they were "writing to appeal the loan modification plan that is attached to this letter" and that they believed they would not be able to afford the monthly payments proposed in the Trial Modification Plan. The Ayreses attached the Trial Modification Plan, not the HAMP denial, to that appeal form. This alone suffices to establish the any-credible-evidence required to sustain the jury's verdict.

¶33 The Ayreses appear to make two arguments to the contrary, both of which we reject. First, the Ayreses point to other evidence in the record, such as Alisha Ayres's trial testimony, which the Ayreses assert establishes that they believed they were appealing the HAMP denial. However, whatever the merits or relative weight of this evidence, it does not alter our conclusion that there was credible evidence to sustain the jury's verdict. Thus, the Ayreses' reliance on other trial evidence fails. *See **McGowan v. Story***, 70 Wis. 2d 189, 203, 234 N.W.2d 325 (1975) ("If there is any credible evidence to support a jury's verdict, irrespective of the weight of evidence to the contrary, it is the obligation of this court to sustain the jury's finding.").

15

¶34    Second, the Ayreses cite to a string of authorities, including *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676 (7th Cir. 2011), and *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661 (9th Cir. 2012), suggesting that RESPA should be construed broadly in favor of borrowers.  The Ayreses assert that the evidence shows they *intended* to appeal the HAMP denial, and that requiring them to specifically state that they were appealing the HAMP denial therefore "runs counter to the purposes" of RESPA.  This argument again fails to come to grips with our standard of review.  Credible evidence supports a finding that the Ayreses *intended* to appeal only the monthly payment amount of the Trial Modification Plan.  For example, there is the language of the written application form itself, which suggests the Ayreses intended only to appeal the monthly payment amount of the Trial Modification Plan.  There is also Alisha Ayres's own testimony, in which she stated, "I appealed the … loan trial modification plan."  Although Alisha Ayres later testified that she was appealing "everything," her testimony as a whole permits an inference that the Ayreses did not intend to appeal the HAMP denial at all.  Thus, regardless of the asserted RESPA policy favoring borrowers, there is credible evidence here suggesting that the Ayreses did not intend to appeal the HAMP denial.

¶35    In sum, there is credible evidence to sustain the jury's answer to special verdict question number four.

### III. Testimony by Wilmington's Corporate Representative

¶36    Finally, the Ayreses argue that the circuit court erred by permitting Peter Joslyn, Wilmington's  corporate representative, to testify based on notes he had prepared for trial summarizing Wilmington's business records without

16

producing those records.[7]   The pertinent background to this argument is as follows.

¶37     Joslyn testified that he reviewed all of Wilmington's records of the Ayreses' loan prior to trial, including the records of all written and telephone correspondence.  In preparation for trial, he prepared a "scratch sheet" of notes from those records, which he created to help him remember the dates, times, and contents of different communications.  Wilmington provided the Ayreses with a copy of Joslyn's notes.  During the trial, Joslyn used the notes to refresh his memory and answer questions.

¶38     The Ayreses objected on the grounds that Joslyn was not testifying from personal knowledge and that his testimony was hearsay.  Additionally, the Ayreses argued that they were entitled to view the documents Joslyn had used to prepare the notes under WIS. STAT. § 906.12 (2017-18),[8] which provides, "If a witness uses a writing to refresh the witness's memory for the purpose of testifying, … an adverse party is entitled to have it produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness."  The circuit court declined to order Wilmington to produce the records Joslyn had used to prepare his notes.

¶39     On appeal, the Ayreses renew their argument that Wilmington was required to produce the records under WIS. STAT. § 906.12, and argue that the

---

[7] While Joslyn was an employee of Wilmington's loan servicer, the parties treat his testimony and the records on which he relied as relating to Wilmington, and we follow their lead.

[8] All references to the Wisconsin statutes are to the 2017-18 version unless otherwise noted.

circuit court's failure to order production means we should remand for a new trial on the counterclaims.

¶40    We assume, without deciding, that the circuit court erred by not ordering Wilmington to produce the records Joslyn used to prepare the notes. However, we agree with Wilmington that the error was harmless.

¶41    "[A]n erroneous exercise of discretion in admitting or excluding evidence does not necessarily lead to a new trial.  The appellate court must conduct a harmless error analysis to determine whether the error 'affected the substantial rights of the party.'  If the error did not affect the substantial rights of the party, the error is considered harmless." *Martindale v. Ripp*, 2001 WI 113, ¶30, 246 Wis. 2d 67, 629 N.W.2d 698 (quoted source omitted); *see also* WIS. STAT. § 805.18(2) ("No … new trial [shall be] granted in any action or proceeding on the ground of … the improper admission of evidence … unless … the error complained of has affected the substantial rights of the party seeking to … secure a new trial."); *see also* WIS. STAT. § 901.03(1) (error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected).  An error does not "affect the substantial rights" of a party unless there is a "reasonable possibility" that the error contributed to the outcome of the proceeding at issue.  *Martindale*, 246 Wis. 2d 67, ¶32.

¶42    Here, the Ayreses do not clearly identify the individual records they believe should have been produced pursuant to WIS. STAT. § 906.12.  However, the Ayreses identify portions of Joslyn's testimony that they believe were based on his review of Wilmington's records and were detrimental to their trial arguments, and we interpret their argument to be that Wilmington should have produced the records underlying those portions of testimony.  Accordingly, we direct our

18

harmless error analysis at the circuit court's failure to order production of the records underlying the portions of Joslyn's testimony identified by the Ayreses.

¶43     As far as we can glean from the briefing, the records the Ayreses assert should have been produced fall into three categories.  We address each.

¶44     The first category of records the Ayreses assert should have been produced relates to the process by which Wilmington arrived at the terms of the Trial Modification Plan.  For instance, the Ayreses point to Joslyn's testimony related to how the proposal's first payment date was decided.  As stated, we interpret their argument to be that the records underlying this testimony should have been produced.

¶45     However, the terms of the Trial Modification Plan are not relevant to any of the claims on which the Ayreses did not prevail.  That is, the terms of the proposal—including the date of the first payment due under it—are not relevant to the determination of any of the special verdict questions which the jury answered "no."  Therefore, failure to produce records related to the creation of those terms had no bearing on the outcome of the Ayreses' claims.

¶46     The second category of records the Ayreses assert should have been produced relates to the documentation Wilmington received from the Ayreses. The Ayreses point to a portion of Joslyn's testimony in which he stated that the Ayreses had sent proof of homeowners' insurance in June 2016.  Additionally, the Ayreses point to testimony concerning Wilmington's internal communications related to the documents Wilmington had received from them.  The Ayreses argue that the records on which this testimony was based "would have helped establish exactly what documents were received, and when."

¶47     However, the only claim to which this testimony was relevant is the claim that Wilmington failed to diligently obtain documents from the Ayreses—a claim on which the Ayreses won. Thus, the failure to produce the documents on which Joslyn based this testimony did not affect the outcome of the Ayreses' claims.

¶48     The final category of records the Ayreses assert should have been produced relates to certain phone calls between the Ayreses and Wilmington in August 2016. Specifically, the Ayreses point to Joslyn's testimony that a Wilmington employee had called the Ayreses on August 4, August 15, and August 29 to discuss the Trial Modification Plan. Joslyn testified that, during these phone calls, the Ayreses expressed concern about the affordability of the plan. Further, he testified that in the phone call of August 29, a Wilmington employee advised the Ayreses that they could not appeal the plan.

¶49     The Ayreses imply that Wilmington's advice in the August 29 phone call is relevant to the determination of special verdict question number four— which asks whether Wilmington handled the Ayreses' appeal in accordance with RESPA. However, Joslyn testified that nowhere in the records of the phone calls did the Ayreses state that they intended to appeal the HAMP denial, and the Ayreses point to no evidence suggesting otherwise. There is therefore no basis to suppose that the records of the August 29 phone call would have revealed an intent from the Ayreses to appeal the HAMP denial, as opposed to the Trial Modification Plan. As a result, the records would have shed no additional light on the question of whether Wilmington properly processed the Ayreses' appeal, and the failure to produce those records is harmless.

¶50    In sum, any error by the circuit court in failing to order production of the documents on which Joslyn based his testimony was harmless.

## CONCLUSION

¶51    We conclude that the circuit court properly overturned the jury's verdict on the Ayreses' duty of good faith and fair dealing claim because the Ayreses have not shown the existence of a contract under which Wilmington had a duty to process their loan modification application in good faith.  We also conclude that because credible evidence supports the jury's verdict concerning the loan modification appeal, the court properly declined to change the jury's verdict. Finally, we conclude that any error by the court in failing to order the production of Wilmington's business records was harmless.

¶52    Therefore, we affirm.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.